IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:23-HC-02237-M

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| JOSEPH SABOT, | ) | |
| | ) | |
| Respondent. | ) | |

This matter comes before the court on the United States' petition for civil commitment of

the Respondent Joseph Sabot pursuant to 18 U.S.C. § 4248. The court heard the matter on July

30-31, 2024, and the parties filed proposed findings of fact and conclusions of law on August 30,

2024. In light of Sabot's release date of September 5, 2024, the court issued a summary order on

September 3, 2024, denying the United States' petition, because it was not established by clear

and convincing evidence that Sabot currently suffers from a mental illness or disorder that would

cause him serious difficulty in refraining from sexually violent conduct or child molestation. DE

60. Here, the court explains its findings and conclusions.

I.     **Case Background**

Sabot is currently thirty-six years old. No party disputes that Sabot experienced significant

trauma during his early childhood. Sabot's father and possibly his mother engaged in sexually

abusive conduct with their children, which Sabot either experienced personally or, at a minimum,

observed. He was removed from the custody of his biological parents, then returned to them, then

removed again and shuttled among foster homes, then separated from his two older siblings, before

finally being adopted by loving parents at the age of six. He was diagnosed with and treated, with

medication and counseling, for severe ADHD as a child. When he was fourteen years old, Sabot was placed on probation and ordered to participate in a nineteen-month residential treatment program after he admitted to sexually abusing a ten-year-old boy by tying the boy's hands behind his back, putting a sock in his mouth, removing his pants, and touching his genitals.

During high school and into his first year in college, Sabot dated two peer-aged girls at the same time, who did not know about each other. He had consensual sex with both girls; however, only one agreed to his request to engage in "bondage and discipline" where he tied her up and blindfolded her during sex. When his girlfriends discovered each other during Sabot's first semester in college in the fall 2007, they both terminated the relationship. Soon thereafter, from December 2007 to March 2008, during which time Sabot was aged 19, he molested four minor children. First, a twelve-year-old girl[1] who, on one occasion, he tied up, removed her clothes, and rubbed her genitals. Months later, after the girl turned thirteen, Sabot started to have intercourse with her until she told him it hurt, and he stopped. Sabot also molested three brothers, aged 6, 8, and 9, by pulling their pants down and fondling them. For this conduct, Sabot pled guilty in state court on April 1, 2009, to six misdemeanor charges of indecent assault on a child and corruption of minors, and was sentenced to 11.5-to-23 months in custody followed by five years of probation, mandatory counseling, and registration as a sex offender. Sabot was released to probation on September 23, 2009.

During the years 2010-2012, while on probation and when he was aged 21-23, Sabot interacted with a girl he met on a dating website, who professed to be eighteen years old, but Sabot soon learned she was actually fifteen when her mother reported her missing after he picked her up

_____

[1] Records reflect conflicting information about the girl's exact age at the time of these offenses. Police reports indicate that her birth year was 1994 with a birthday in April. If true, she would have been thirteen at the time of both offenses. However, the charges seem to indicate that she was twelve for the first offense and thirteen for the second.

2

at her home in West Virginia and brought her to his house in Pennsylvania in July 2010. No charges were made at the time, because police determined the girl went "willingly" with "her boyfriend." Sabot continued to visit the girl at her house with her mother's knowledge. When Sabot brought the girl to his parents' house in Pennsylvania in March 2012, Sabot's father found her sitting in Sabot's car in the garage and "kicked her out"; she then called police because she had no way to get home and nowhere else to go. Law enforcement investigated and, eventually, in February 2014, Sabot was federally indicted in Pennsylvania for transporting a minor across state lines for sexual activity. He pled guilty to a lesser offense of traveling with the intent to engage in illicit sexual conduct with a minor in violation of 18 U.S.C. § 2423(b), and he was sentenced to 144 months in custody and twenty years on supervised release.

Sabot arrived at the Federal Correctional Institution (FCI) Petersburg on August 13, 2016, at which he completed two Sex Offender Management Program groups, maintained employment as a kitchen clerk and compound clerk (for which he received commendations and raises), and incurred three phone violations over a period of more than six years.

In November 2022, Sabot agreed to participate in residential sex offender treatment and was transferred to Federal Medical Center (FMC) Devens in December 2022. After Sabot was caught entering the cell of a transgender inmate on March 13, 2023, while the inmate was sleeping, the program imposed a behavioral intervention plan requiring that Sabot cease to interact with the inmate. Sabot was expelled from the program in early August 2023, after failing to complete homework and internalize concepts, and after violating the plan by continuing to contact and "dally with" the transgender inmate. Sabot arrived at FCI Butner on August 28, 2023, and was certified as a sexually dangerous person on October 24, 2023. He has received no conduct citations while residing at FCI Butner.

3

Relevant to this case, while at FMC Devens, Sabot underwent penile plethysmograph (PPG) testing on March 15, 2023. The PPG is a standardized non-pornographic system (in this case, the MONARCH 21 Behavioral Technology System) designed to measure sexual responsiveness to a variety of stimulus objects across gender, age, and sexual activity. The instrument measures changes of tumescence in an adult male penis when exposed to visual and/or audio stimuli. Sabot underwent two MONARCH 21 PPG tests, the first known as the "Adult Male Stimulus Set" and the second known as the "Rape Stimulus Set" or the "Alternate Stimulus Set." The first test attempts to identify arousal patterns in regard to age, gender, and violence. The subject is played first an audio segment and then shown four images. The second test focuses on violence/coercion and is strictly audio segments. No transcripts or detailed descriptions were provided for the audio stimuli.

Staff at FMC Devens interpreted the raw data and concluded, as set forth in Sabot's Psychosexual Evaluation, that Sabot has a preference for prepubescent and pubescent children based on what they called a "deviance differential." The "deviance differential" is designed to "compare the relative amount of responding to age-appropriate adult stimuli versus the relative amount of responsiveness to stimuli depicting pubescent and prepubescent children." A negative score indicates a preference for pubescent and prepubescent individuals while a positive score indicates a non-deviant preference. FMC Devens calculated a score of -0.6558, which is not one standard deviation away from the mean, and therefore, does not appear to show a clinically significant preference. The United States relies significantly on the results of these tests in support of civil commitment. As discussed further below, the court finds the government's reliance on the tests problematic.

4

## II.    Legal Standards

For purposes of civil commitment under § 4248, a "sexually dangerous person" is defined as "a person [1] who has engaged or attempted to engage in sexually violent conduct or child molestation and [2] who is sexually dangerous to others." *United States v. Broncheau*, 645 F.3d 676, 679 (4th Cir. 2011) (citing 18 U.S.C. § 4247(a)(5)).   A person is "sexually dangerous to others" if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." *Id.* (citing 18 U.S.C. § 4247(a)(6)).

"If, after a hearing, the court finds by clear and convincing evidence that the respondent is a 'sexually dangerous person,' it must 'commit the person to the custody of the Attorney General.'" *Id.* at 680 (quoting 18 U.S.C. § 4248(d)).  Such respondent remains so committed until he is "no longer sexually dangerous to others." *Id.* (citing § 4248(d)).

"Clear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." *United States v. Hall*, 664 F.3d 456, 461 (4th Cir. 2012) (citation omitted).

## III.    Analysis

The court has fully reviewed and considered the entire record, including the parties' studied and comprehensive proposed findings of fact and conclusions of law, and incorporates or summarizes them in part, as set forth herein.

In this case, Sabot concedes, the experts agree, and the court finds that Sabot meets the first prong of the "sexually dangerous person" test (history of child molestation).  Sabot disputes, however, that he meets the second prong of the definition (sexually dangerous to others), which itself has two parts—i.e., (1) he currently suffers from a serious mental illness, abnormality, or

5

disorder (2) that would cause him serious difficulty in refraining from sexually violent conduct or child molestation if released. *See United States v. Shea*, 989 F.3d 271, 276 (4th Cir. 2021).

Regarding the first part of the second prong, the Fourth Circuit instructs that labeling a respondent with a "diagnosis" is merely a starting point and that "the true thrust of the § 4247(a)(6) inquiry [is] whether, on a case-specific basis, the respondent's underlying condition constitutes a serious functional impairment." *United States v. Caporale*, 701 F.3d 128, 137 n.4 (4th Cir. 2012). In addition, the illness or disorder must be current: "[t]he structure of the Act, which requires discharge if the inmate is no longer sexually dangerous, clearly shows that Congress believed that sexually dangerous predators could change and grow out of the sexually-dangerous classification." *United States v. Wooden*, 887 F.3d 591, 607 (4th Cir. 2018).

Regarding the second part, [t]he "serious difficulty" prong of 4248's certification refers to the degree of the person's "volitional impairment," which impacts the person's ability to refrain from acting upon his deviant sexual interest. *Hall*, 554 F.3d at 463. The Fourth Circuit has found that in weighing the serious difficulty prong, it is appropriate to consider the following factors: failures while on supervision; resistance to treatment; continued deviant thoughts; cognitive distortions; actuarial risk assessments; impulsiveness; and historical offenses. *United States v. Montgomery*, 310 F. Supp. 3d 637, 645–46 (E.D.N.C. 2018) (citing *Wooden*, 693 F.3d at 447 n.2). "It should be noted, however, that this inquiry 'will not be demonstrable with mathematical precision.'" *Id.* at 646 (quoting *Kansas v. Crane*, 534 U.S. 407, 413 (2002)).

A.      Serious Mental Illness, Abnormality, or Disorder

The Fourth Circuit has instructed that the second prong of the Section 4248 certification test requires an evaluation by a mental health professional. *United States v. Francis*, 686 F.3d 265, 275 (4th Cir. 2012). "Expert opinion is critical to determining whether [an individual] suffers from a mental illness. *United States v. Castrejon-Alvarez*, 549 F. App'x 162, 164 (4th Cir. 2013)

6

(citing *Addington v. Texas*, 441 U.S. 418, 429 (1979)). "Whether [an] individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." *United States v. Bolander*, 722 F.3d 199, 207–08 (4th Cir. 2013) (quoting *Addington*, 441 U.S. at 429). Moreover, "[c]ivil commitment is limited to individuals whose mental illness renders them dangerous beyond their control. *Francis*, 686 F.3d at 275.

In this case, five experts conducted forensic evaluations of Sabot, produced written reports, and testified consistently with their reports at the hearing. Three of the five experts, including one appointed by the court, determined that Sabot currently suffers from no serious mental illness, abnormality, or disorder as contemplated by Section 4248, and, even if he did, Sabot would not have serious difficulty refraining from sexually violent conduct or child molestation as a result of such illness, abnormality, or disorder. The court agrees with these opinions.

Joseph J. Plaud, Ph.D., M.A.T., K.H.S., K.M., is a Forensic Psychologist who met with Sabot in person at FMC Butner on January 23, 2024. Dr. Plaud detected no evidence of a generalized organic basis for cognitive impairment. He found Sabot to be pleasant and cooperative during the clinical interview, properly oriented as to person and place, and he displayed no difficulties articulating basic current information or complying with specific directions during the evaluation. Sabot appeared to be his stated age of 35 years.

Dr. Plaud found no basis on which to diagnose Sabot with a mental illness, abnormality, or disorder related to any ongoing sexual impulse control problem. The doctor testified credibly, however, that this is a "close case" when considering a pedophilic disorder. *See* Tr. II, 344:15-349:12. Dr. Plaud acknowledged that it may be an appropriate diagnosis under the DSM-5-TR, given Sabot's history of sexual offenses and the negative impact they had on his life; however, he

7

ultimately concluded that Sabot does not suffer from a disorder (pedophilic or otherwise) that constitutes a current, serious functional impairment. *See id.*

The doctor asserts that juvenile sexual offenses or borderline sexual offenses of young adults are poor predictors of long-term sexual volitional difficulties, which set the occasion for further sexual offenses when that person ages past thirty-five years old. Report, DE 22 at 3. He found that Sabot appears to have shown in the last several years the social, emotional, and maturational gains that currently serve as significant protective factors, stating "Sabot is now thirty-five years old and continues to show behavioral regulation and control" and "there is no evidence of a clinical nature now that Sabot experiences the hallmark symptoms of a disorder." *Id.*; *see also id.* at 20.

Of the five experts, Dr. Plaud has the most experience studying and administering PPG tests. In his addendum and testimony, Dr. Plaud discussed "potential sources of variability" that should be considered when weighing the results of these tests. Specifically, regarding Sabot's tests, Dr. Plaud identified four areas of concern: (1) "[t]he type of sexual stimuli used (audio, video, both)"; (2) "[s]pecific sexual scenes depicted by the sexual stimuli used;" (3) "[t]he data sampling rate and type of data interpretation used of PPG results"; and (4) "[t]he setting of the assessment facility (e.g., prison vs. outpatient setting)." Add., DE 42 at 4. Based on Dr. Plaud's (and other doctors') persuasive testimony, the court finds questionable the reliability of the PPG tests applied to Sabot, including the type of stimuli presented, the lack of information about the stimuli, lack of standards for the stimulus sets, lack of information regarding statistical choices made by the staff at FMC Devens, and the inability to truly assess to what Sabot may have been responding. In light of these issues, as well as the other records and information considered, Dr. Plaud was unable to conclude to a reasonable degree of psychological and scientific certainty that Sabot suffers a

8

mental disorder which would cause him, in the present tense, to lack volitional capacity or have serious difficulty in controlling himself sexually.

Dr. Plaud opines that there appear to be unique perpetrator-victim characteristics in Sabot's sexual offense history, involving specific social influences and historic social immaturity and faulty decision making as a juvenile and young adult at a behavioral level that are unlikely to be replicated in the present and moving forward, especially given the lengthy term of supervised release, with conditions, that will apply to Sabot when he returns to the community. Dr. Plaud believes that during the past decade Sabot has evidenced psychological maturation and does not now appear to engage in primary cognitive distortions nor demonstrate any sexually problematic behaviors institutionally. He found the major protective factors in Sabot's case currently include: (1) a lack of acute sexual deviance; (2) Sabot's sexual offense history dates back now over a decade, he is now approaching middle adulthood, and his last prepubescent victim occurred when Sabot himself was still a teenager; (3) a lack of major mental illness; (4) a lack of psychopathy; (5) Sabot currently shows prosocial behavior; and (6) Sabot has shown sexual behavioral stability and control institutionally. In light of these factors, which outweigh the risk factors, Dr. Plaud concludes that Sabot would not have serious difficulty in refraining from further acts of child molestation and therefore would not commit an additional sexual offense if not further confined to a secure facility.

Brian R. Abbott, Ph.D., Forensic Psychologist, met with Sabot twice at FCI Butner on February 15 and 16, 2024 for a total of six hours and thirty minutes. He also interviewed Sabot's mother by telephone for fifty minutes on February 27, 2024.

Dr. Abbott diagnosed Sabot with persistent depressive disorder early onset, with pure dysthymic syndrome, mild, and found, to a reasonable degree of psychological certainty, that this condition is not a serious mental illness, abnormality or disorder as contemplated by applicable

9

law. He also considered and ruled out other possible diagnoses, including PTSD, ADHD, disinhibited social engagement disorder, antisocial personality disorder, and sexual sadism disorder. Regarding pedophilic disorder, Dr. Abbott concludes Sabot does not meet necessary criteria for the following reasons: (1) Sabot has not reported that his sexual interest or sexual arousal toward prepubescent children is equal to or greater than his sexual arousal or interest to age-appropriate partners; (2) the Look visual reaction time (VRT) test, which evaluates the reaction to 154 photographs of children and adults, indicated that Sabot did not present with clinically significant sexual interest in prepubescent children; (3) the PPG tests in 2023 discovered a broad range of clinically significant sexual arousal involving women, males (prepubescent, pubescent, and post-pubescent), and females (prepubescent and teen): "The results from the testing did not reflect whether Sabot suffered from a sexual preference for prepubescent children, and this was unlikely given he was less responsive to this category of stimuli as compared to his other clinically significant responses. This broad array of responding to males and females of various sexual physical developmental levels is consistent with someone whose sexualized coping and sexual preoccupation has been satisfied by a wide range of deviant and nondeviant sexual behavior. The apparent ability to become aroused by prepubescent children while not exhibiting a preference for them is consistent with the published research showing that the vast majority of child molesters and individuals who report sexual interests in prepubescent children do not suffer from criterion A of pedophilic disorder."; (4) Sabot has not demonstrated sexual offense analog behavior in custody involving pedophilia; and (5) Sabot reports that his strongest sexual interests are directed toward adult and adolescent males and females, which is consistent with the findings from the Look VRT. Report, DE 27 at 45.

Dr. Abbott also testified concerning the statistical analysis performed of the raw data by the staff at FMC Devens. He discovered that the raw data for Sabot's most clinically significant

10

response, as even FMC Devens staff noted, was excluded from the calculation of the "deviance differential." When viewing the stimulus time maximum, Sabot responded nearly three times more to the stimulus named "Female Challenge 2," which involved adult women, than his second most significant clinical response. When included in the differential calculations, Sabot's deviance differential score is +1.8, nearly two standard deviations away, showing a much stronger preference for non-deviant stimuli.

In addition, Dr. Abbott discussed the significance of the "cut-off" point to establish a clinically significant response to stimuli. FMC Devens clinicians utilized a cutoff point of 10% of a full erection to determine clinical significance, which means that the tumescence must change by only .47 centimeters to be deemed clinically significant. Such a low cut-off point invites measurement errors caused by random fluctuations in penile tumescence. Furthermore, Dr. Abbott noted that several of Sabot's responses would not be deemed clinically significant if a more conservative cutoff point, such as 20%, was utilized. In fact, a 20% cut-off would result in no clinically significant response to any prepubescent stimuli.

The court notes here that it heard significant testimony about the problems arising from application of the PPG test to Sabot, and the government offered no persuasive evidence to counter that testimony. Ultimately, it is impossible to conclude to what exactly an individual is responding when undergoing a PPG. The court was not provided with any description of the images or audios. Furthermore, the court is concerned about the exclusion of the data from "Female Challenge 2" when establishing a "deviance differential" and agrees that it is statistically misleading to discount Sabot's most clinically significant response from that calculation. For all of these reasons, the court places little weight on these results when considering any diagnosis.

Dr. Abbott opines that Sabot does not suffer from a serious mental illness, abnormality, or disorder, but even if he did, such disorder would not result in Sabot having serious difficulty

11

refraining from sexually violent conduct or child molestation. He notes that courts have characterized emotional or volitional impairment as normally involving individuals who find it particularly difficult to control their behavior, and they provide the example of "compulsive, repetitive, driven behavior . . . appears to fit the criteria of an emotional or psychiatric illness." Report, DE 27 at 49. Courts also have weighed historical and current evidence of serious difficulty refraining ("SDR") with an emphasis on *current* manifestations of the condition when determining whether the individual would have SDR because of his serious mental illness. *Id.* at 50 (emphasis added). Notably, static or dynamic risk factors provide no relevant nor probative information whether the risk potential would be the product of the dangerous but typical recidivist convicted in the ordinary criminal case who makes a voluntary choice to reoffend sexually or because the individual suffers from a serious mental disorder that results in him having SDR from child molestation or sexually violent conduct if released. *Id.* Thus, Dr. Abbott finds they are not persuasive.

Sabot committed his sexual offenses between the ages of 14-22 years. Dr. Abbott finds this span of development has important implications, because it involves the time when the physical development of the brain, particularly the prefrontal cortex, has yet to fully mature. Sabot reports that, when he committed the offenses, he did not try to control himself; however, when his teenage girlfriends (in high school and when he was aged 21-22) did not want to engage in bondage and discipline, he did not force or cajole them. *See* Report at 51. The doctor finds this demonstrates Sabot's ability to control himself. In addition, Dr. Abbott asserts that, if Sabot's mental condition resulted in SDR from child molestation or sexually violent conduct, it would be expected for him to have demonstrated evidence of it while in custody in the form of sexual offense analog behaviors, such as viewing child pornography or erotica, cutting out images of children and constructing a photo album or collage to evoke sexual excitement, or reading stories that depict

12

adult and child sexual activity. *Id.* According to the doctor, the absence of Sabot displaying sexual offense analog behaviors in custody reflects his current ability to control the commission of child molestation or sexually violent conduct. *Id.*

Karen Franklin, Ph.D., a court-appointed Forensic Psychologist, evaluated Sabot at FCI Butner on January 22, 2024, for a total of five hours, and interviewed Sabot's parents on January 26 and February 5, 2024, for a total of two-and-a-half hours. Dr. Franklin described Sabot as pleasant and cooperative throughout the interview and even gregarious and jovial at times. She found that his speech was normal in rate, tone, and volume. He was calm and good-natured, exhibiting a normal range of emotional expression. His intelligence appeared to be in the average to slightly above-average range. He also demonstrated some capacity for introspection and contemplation, but he was careless with the accuracy of information that could be verified with written records. Dr. Franklin testified that, to remedy the carelessness, she corroborated information through other sources, including relevant documents and statements from Sabot's parents.

Dr. Franklin found no signs or symptoms of major mental disorder such as psychosis, mania, anxiety, or depression. She considered and rejected several potential psychiatric diagnoses in this case. For pedophilia, Dr. Franklin found that "isolated acts in the distant past are insufficient to establish the existent of recurrent, intense, sexually arousing fantasies, urges or behaviors toward prepubescent children at the present time, more than 16 years later." Report, DE 28-1 at 15. For sexual sadism, the doctor stated that, "even though Sabot would prefer that his sexual partners agree to bondage, he describes taking care to obtain consent, and there is no evidence to suggest that he has engaged in such behaviors with nonconsenting partners as an adult." *Id.* at 16. Regarding other sexual paraphilia, Dr. Franklin found "insufficient data to support a finding," and

for antisocial personality disorder, she found no evidence of a conduct disorder before the age of fifteen and no evidence of pervasive callousness at any age. *See id.*

Dr. Franklin testified that the serious trauma Sabot suffered in his early childhood, including neglect and abandonment, "paved the way for his delayed maturation over the course of his life." Tr. II, 422: 8-10. She explained that when fear reflexes in the amygdala of the brain are consistently, or chronically, activated, they can interfere with the development of stable cognitive processes, such as coping, problem-solving, and regulating emotions. Furthermore, she opined that "immature cognitive development in conjunction with normal pubertal development is not a good combination because the person is experiencing . . . sexual urges that they may not have the cognitive capacities to correctly, effectively regulate." *Id.* 425: 11 – 426: 1. Thus, although Sabot's likely attachment disorder was resolved after his adoption, "he remained developmentally immature" and, accordingly, Sabot's instances of adolescent sexual offending at the ages of 14 and 19, which had an exploratory, juvenile-like quality, suggest they were driven more by immaturity and hormonal urges than by a fixed, adult-like pattern of sexual deviance. Report at 16. Dr. Franklin also noted that the record indicates the reported 12-year-old girl was actually 13 and 14 years old at the time of the offenses. Tr. II, 439: 23 – 440: 9.

Dr. Franklin determined that Sabot's final offense, spanning the ages of 21 to 23, was statutory in nature, in that the girl turned out to be a minor, and he did not display indicia of any paraphilic attractions to children—as the girl was by all accounts physically mature—or to sexual coercion. *See* Report at 16. The doctor noted that Sabot was free in the community for approximately two years after this offense without any known sexual or non-sexual criminal conduct, and he has exhibited no type of paraphilic or offense analog behavior while incarcerated. *Id.* at 14-15. She also reported that adolescent sex offenders whose offending is influenced by immature judgment and decision-making skills are far less likely to sexually reoffend as mature

14

adults, and this is especially true when problems with alcohol and/or drug use are absent and Sabot will be under mandatory supervision, including stringent conditions, for twenty years. *Id.* at 19. She opined that Sabot does not currently suffer from a serious mental illness, abnormality, or disorder, and if he did, Sabot would not have serious difficulty refraining from sexually violent conduct or child molestation as a result of such illness, abnormality, or disorder if released under a prescribed regimen.

The United States' experts both agreed that Sabot suffers from several mental illnesses or disorders that would cause him to have serious difficulty refraining from child molestation if released from custody. Justin Rigsbee, Ph.D., Psy.D., a Forensic Psychologist for the Bureau of Prisons, evaluated Sabot by telephone on two occasions totaling five hours in April and June 2023. Dr. Rigsbee diagnosed Sabot with numerous disorders, including pedophilic disorder, non-exclusive, sexually attracted to both; other specified paraphilic disorder (OSPD), (hebephilia) sexually attracted to pubescence males and females; sexual sadism disorder; antisocial personality disorder; and persistent depressive disorder. Report at 29-30, DE 7-1. In reaching his conclusions for pedophilic disorder, OSPD, and sexual sadism, Dr. Rigsbee relied in part on the PPG test results, despite conceding that he is not an expert in PPGs and had not previously viewed or interpreted raw data from one of the tests. *See* Tr. I, 216-219. Additionally, Dr. Rigsbee relied on Sabot's self-reports in diagnosing him. *See id.* Notably, however, all of the experts agreed, and Sabot concedes, that Sabot is not a reliable historian and has had difficulty telling the truth, even, as Dr. Franklin noted, when it was not in his best interest.

To support his diagnosis of antisocial personality disorder, Dr. Rigsbee relied primarily on evidence of Sabot's sexual offenses, his lying, losing two jobs, stealing money from his mother's purse when he was eleven years old, and an incident in fifth grade that resulted in Sabot's suspension from school. Tr. I, 168:22-169:14; 170:2-171:3. To support his sexual sadism

15

diagnosis, Dr. Rigsbee argued that Sabot was aroused by the psychological suffering of his victims and relied on Sabot's offense conduct, the results of the "Alternate Stimulus Set" PPG test, and Sabot's self-reports on the Multiphasic Sex Inventory II. *Id.* at 164:2-165:11; 166:17-23; 167:11-17. As set forth in more detail below, the court is not persuaded.

Erik Fox, J.D., Ph.D., a Forensic Psychologist retained by the United States, evaluated Sabot by video conference on January 2, 2024, for approximately four hours. Dr. Fox diagnosed Sabot with pedophilic disorder, non-exclusive, sexually attracted to both; OSPD, deviant sexual interests in hebephilic, sadistic, exhibitionistic, and voyeuristic behavior; and antisocial personality disorder. Report at 30, DE 21-1. Regarding the personality disorder, Dr. Fox relied on much of the same evidence as Dr. Rigsbee. Tr. I, 255: 21 – 269-: 5. The court finds the evidence in this case does not indicate that Sabot suffered from the type of conduct disorder before the age of 15, nor a pervasive callousness, as required for an antisocial personality disorder diagnosis.

Regarding the OSPD diagnosis, Dr. Fox testified that he could not reach a reasonable degree of certainty that Sabot met the criteria for each of the specifiers—hebephilic/pubescence, sexual sadism, exhibitionism, or voyeurism—on their own (*id.* at 298:10-300:20), and the court is troubled by the combination of multiple insufficient specifiers, which does not appear to have been contemplated by the DSM-5-TR.

Finally, like Dr. Rigsbee, Dr. Fox relied on the PPG results, Sabot's statements, and Sabot's offense conduct to support his pedophilic disorder diagnosis. *Id.* at 258:2-13; 269:10-21; 303:3-8. Dr. Fox further expressed his belief, based on his interview of Sabot, that Sabot's offense conduct involving the four brothers occurred at the same time Sabot was dating his peer-age girlfriends. *Id.* at 262:1-11. However, the written records reflect that Sabot graduated from high school in the summer 2007, and the conduct involving the brothers occurred in March 2008, which is consistent with Sabot's version of events—i.e., that his girlfriends terminated their relationships

16

with him during his first semester of college in the fall 2007 and the offense conduct occurred *after* the break-ups. The court finds Sabot's testimony on this issue credible.

Although other diagnoses were suggested,[2] the court considers only those consistently applied and/or considered by the experts in this case: pedophilic disorder; other specified paraphilic disorder, hebephilia/pubescent children; and antisocial personality disorder. Regarding pedophilic disorder, the court finds persuasive the experts' opinions that evidence of Sabot's early childhood trauma must be considered for a pedophilic diagnosis in conjunction with his offense behavior and progressing cognitive changes, and concludes that it appears more likely that Sabot's early sexualized behavior was not an early onset paraphilic pattern but, rather, abuse reactive behavior caused by the abandonment, neglect, and sexual abuse he witnessed and/or possibly experienced. This trauma likely delayed Sabot's psychological development and left him unprepared to deal with the hormonal surges of puberty.

Notably, Dr. Plaud testified that under a technical application of the diagnostic criteria, Sabot could be diagnosed with pedophilic disorder. However, Dr. Plaud did not find the present manifestation of that disorder to be a "serious functional impairment," as required by statute. The court agrees; under the DSM-5-TR, pedophilic disorder cannot go into remission (Tr. I, 258:18-21), but it is a separate inquiry whether the disorder remains a "serious functional impairment" for the individual. As the Fourth Circuit instructs,

> [a] diagnosis of hebephilia (or pedophilia, or other mental disorder) is merely the starting point for the court to consider the true thrust of the § 4247(a)(6) inquiry—whether, on a case-specific basis, the respondent's underlying condition constitutes a serious functional impairment.

---

[2] The court finds insufficient evidence to support these "other" diagnoses. For example, while there was significant testimony concerning a sexual sadism disorder, the court notes that only one expert offered this full diagnosis and finds the testimony of the remaining experts more persuasive. The court finds insufficient evidence to conclude that Sabot meets criteria for a sexual sadism disorder, including the arousal by either the physical or psychological suffering of his victims.

17

*Caporale*, 701 F.3d at 137, n.4. Thus, the government must establish not only the presence of a mental illness or disorder, but also that such illness or disorder is a serious functional impairment. The court finds the United States has failed to demonstrate by clear and convincing evidence that Sabot currently suffers from a persistent and intense attraction to prepubescent children that is impairing his life. The only evidence of current, serious impairment offered by the government are the PPG test results, which the court has found unreliable, and Sabot's inconsistent statements about his sexual attractions. Nothing in the record indicates analog behaviors or an intense, ongoing attraction to prepubescent children. While recognizing that Sabot has no access to prepubescent (or pubescent) children while in custody, the court cannot conclude, on the record before it, that Sabot has a serious functional impairment caused by pedophilic disorder.

With respect to the diagnosis of OSPD, hebephilia/pubescent children, the court notes that all experts concede this is a controversial diagnosis in the psychological community, which was rejected from inclusion into the DSM-5-TR. Drs. Plaud and Franklin reject such a diagnosis entirely, while Drs. Rigsbee, Fox and Abbott agree that it can be a viable diagnosis. However, Drs. Fox and Abbott acknowledge the inherent difficulties in diagnosing such a disorder. Specifically, it is difficult to establish the Tanner Stage development of the victim, and alternative motivators for the offending can exist. In rejecting this diagnosis, Dr. Fox testified that he could not ascertain Sabot's "primary purpose of offending" against the twelve-year-old girl and, without the ability to conclude that pubescence was the primary purpose, he could not reach a diagnosis with sufficient psychological certainty. Tr. I, 303: 16 – 304: 7. The court also cannot determine from the evidence before it whether Sabot has a current, serious functional impairment caused by hebephilia. While the record indicates that the girl involved in the 2008 conduct was twelve-to-thirteen years old and the girl involved in the 2010 conduct was fifteen years old, other evidence,

18

including expert testimony, demonstrates that the girls may have been further developed. Accordingly, the court does not find that the government has established by clear and convincing evidence a diagnosis of other specified paraphilic disorder, hebephilia/pubescent children.

Finally, as noted above, the court finds insufficient evidence that Sabot suffers from an antisocial personality disorder. The court is not persuaded, in light of Sabot's traumatic early childhood, that his behavior before the age of fifteen is truly demonstrative of a conduct disorder. Furthermore, as Dr. Franklin testified, all children misbehave, but "[a] conduct disorder requires pervasive problems across multiple spheres, including in the home, at school, and in the community." Tr. II, 429: 2-5. The evidence before the court demonstrates that Sabot misbehaved (and, even, acted abhorrently at age fourteen in molesting the ten-year-old boy), but the isolated incidents do not establish the type of pervasive conduct necessary to constitute a disorder. Even if they did, Sabot's conduct since that time does not show a consistent pattern of disregard for the rights/interests of others. The government has failed to demonstrate by clear and convincing evidence that Sabot currently suffers from a serious mental illness, abnormality, or disorder as contemplated by Section 4248.

B.    Serious Difficulty Refraining from Sexually Violent Conduct or Child Molestation

Even had the court attributed to Sabot at least one of the diagnosed disorders and found it to be serious, the United States has failed to meet its burden to convince the court that any of these disorders would cause Sabot to have serious difficulty in refraining from sexually violent conduct or child molestation.

"The 'serious difficulty' prong of 4248's certification refers to the degree of the person's 'volitional impairment,' which impacts the person's ability to refrain from acting upon his deviant sexual interest." *Hall*, 554 F.3d at 463 (citations omitted). In considering the serious difficulty prong, courts should consider the following factors: "failures while on supervision; resistance to

19

treatment; continued deviant thoughts; cognitive distortions; actuarial risk assessments; impulsiveness; and historical offenses." *Montgomery*, 310 F. Supp. 3d at 645-46. The court must also consider whether respondent has prior experience in the community without committing a hands-on offense, respondent's ability to comply with institutional rules, experience with sex offender treatment, respondent's testimony regarding volitional control, and his supervised release conditions. *Hall*, 664 F.3d at 465–67.

Importantly, courts may not "consider historical facts to the exclusion of present behavior because reliance on past behavior does 'not allow for a respondent's subsequent growth.'" *Id.* (quoting *United States v. Antone*, 742 F.3d 151, 169 (4th Cir. 2014)). There must be "sufficient evidence of an *ongoing* volitional impairment." *Antone*, 742 F.3d at 168 (emphasis added).

The court finds that consideration of the *Wooden* factors weighs in Sabot's favor. While his historical offenses, particularly at ages 14 and 19, are alarming, the court notes that Sabot's last hands-on offenses with prepubescent children occurred sixteen years ago. Furthermore, his most recent offense was with a consenting postpubescent teenager, and he was initially attempting to establish a relationship with an adult. Also, the record is not clear that Sabot continues to engage in deviant thoughts. While he has demonstrated some minor cognitive distortions (e.g., inconsistent responses to clinical questions), the court does not find they rise to a level of serious concern. Rather, Sabot testified that he takes responsibility for his crimes, feels remorse, and acknowledges the harm he caused his victims. In so doing, he has demonstrated a maturing of his ideas and the regulation of his emotions.

Granted, Sabot violated the conditions of his supervision for the cluster of offenses in late 2007 and 2008, both with minor violations and new serious criminal conduct. However, this is not a case where Sabot has failed at supervision terms repeatedly, but rather he had multiple violations during one term when he was in his early 20s. Sabot has also largely complied with

20

institutional rules for much of his incarceration. Except for the six months in the sex offender treatment program at FMC Devens, Sabot adjusted well to custody, maintained successful employment, and had few issues. During the last year of his incarceration at FCI Butner, Sabot has had no noted behavioral issues, has maintained employment, and has engaged in programming. Finally, the court finds that, although Sabot may have demonstrated impulsivity in some of his offenses, he showed the ability to control himself in others, and nothing in the record demonstrates a current lack of volitional control.[3]

Of course, Sabot's conduct while at FMC Devens raises some questions. Sabot agreed to participate in the sex offender treatment program, but his behavior demonstrates that he was not invested and he failed out of the program. Sabot attributes his failure to a lack of trust and confidentiality in the process, and the United States argues that Sabot's behavior demonstrates he is resistant to treatment. The court finds that Sabot's testimony regarding this matter—i.e., he believed he was going to be released soon so determined the treatment was no longer necessary— demonstrates a lack of both maturity and the ability to process in a logical way the implications of his decision. This aligns with the Respondent's position that his actions have mostly occurred by way of limited emotional and cognitive maturity. While Sabot's limitations in these areas cause the court some concern, the concern is not that Sabot will have difficulty refraining from violent conduct or child molestation. Rather, the concern is that Sabot continues to need guidance and supervision as he negotiates his transition to release from custody.

The court finds its concerns mitigated by Sabot's strong family support and the conditions

---

[3] The court recognizes the argument that Sabot demonstrated he lacks volitional control by continuing to interact with the transgender inmate at FMC Devens despite a no-contact order. As discussed below, the court attributes Sabot's behavior to a lack of maturity and mildly limited cognitive abilities, and finds this conduct does not support a finding that Sabot would have serious difficulty refraining from violent conduct or child molestation.

under which he will be supervised during the next twenty years. Sabot's parents have continued to remain actively involved and supportive of their son; the court notes they were present in court for his two-day hearing. When released, Sabot intends to return to his parents' home, which has been approved by the United States Probation Office as an acceptable residence. Sabot has expressed his intentions to find employment using the skills he acquired in bookkeeping and working as a clerk while in the BOP; continue to take Paxil, which has improved his moods; seek and participate in mental health and sex offender treatment; and follow all other conditions of his supervised release.

In essence, the record presented here does not establish by clear and convincing evidence that Sabot presently suffers from a mental illness or disorder that causes a lack of volitional control, such that Sabot would have serious difficulty refraining from child molestation or sexually violent conduct if released to the community. *See Montgomery*, 310 F. Supp. 3d at 646 ("The Adam Walsh Act applies to individuals who lack volitional control, not those who may, in the future, go on to commit crimes.") (citing 18 U.S.C. § 4247(a)(6)). This is particularly true in this case, where Sabot will be federally supervised for twenty years under conditions that require he participate in sex offender treatment; undergo psychological testing and polygraph examination; associate with no children under 18 years old without supervision and/or approval of his federal probation officer (USPO); neither view nor possess child pornography and refrain from corresponding with anyone who provides such material or entering venues where it is the primary product for purchase or viewing; neither use nor possess a computer to access child pornography or communicate with others for the purpose of promoting sexual relations with children; register as a sex offender; submit to searches by the USPO; undergo mental health evaluation and treatment; and provide the USPO complete access to his financial information. The record does not demonstrate by clear and convincing evidence that, under these circumstances, Sabot will find it difficult to refrain from

22

molesting children or engaging in other sexually violent conduct.

CONCLUSION

"The Adam Walsh Act is an extraordinary remedy for extraordinary circumstances." *Montgomery*, 310 F. Supp. 3d at 644. Sabot's history, including both lawful and unlawful conduct, does not sufficiently reflect the extraordinary circumstances warranting indefinite, involuntary commitment under the Act. Thus, the court finds the United States has failed to meet its burden of demonstrating, by clear and convincing evidence, that Sabot must be civilly committed as a sexually dangerous person under 18 U.S.C. § 4248. The United States' petition is DENIED.

In addition, the court finds the United States does not demonstrate a sufficient basis on which to grant a stay of execution of the judgment in this case and, therefore, the United States' Motion to Stay Judgment [DE 64] is DENIED.

SO ORDERED this __2d__ day of October, 2024.

Richard E. Myers II

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE